## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **KRISTEN LAWLER** | : | |
| *f/k/a Kristen Alleman*, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-2112** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **TRINITY FINANCIAL SERVICES,** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before this Court on Plaintiff Kristen Lawler's Motion for Summary Judgment (ECF No. 24). For the reasons explained below, Plaintiff's Motion is **GRANTED IN PART AND DENIED IN PART**: **GRANTED** as to Plaintiff's April 2022 response letter FDCPA claim and Plaintiff's February Letter RESPA claim, and **DENIED** as to Plaintiff's October Letter RESPA claim.

## I.       BACKGROUND

This case revolves around Plaintiff and her ex husband's property in Marysville, Ohio. (ECF No. 2 at 5). Plaintiff and her then-husband financed the property in 2006 by way of an 80/20 loan, whereby they took out two mortgages through SouthStar Funding LLC. (*Id.*). Plaintiff was awarded their property in their divorce and, a few years later, in 2010, she entered into a loan modification with GMAC Mortgage, LLC to lower her interest rate. (*Id.* at 6). Plaintiff believed this loan modification combined both of the property's mortgages. (*Id.*). Just over a decade later, Plaintiff sought to sell the property in order to move out of state. (*Id.* at 7). During the attempted

sale, Plaintiff learned that the loan modification did not, in fact, include the smaller of the two original mortgages, but instead remained as a lien against her property. (*Id.*).

Plaintiff therefore set out to confirm the details of this second mortgage. She first reached out to Defendant in September 2021, who informed her that FCI Lender Services had assumed servicing responsibilities for her second mortgage. (*Id.*). But when she called FCI, it informed her that Defendant had reassumed the second mortgage in 2016. (*Id.*). On her second attempt, Defendant then claimed the second mortgage, so Plaintiff requested "a copy of the Second Mortgage documents and as many details as possible." (*Id.*). Defendant did not respond to the bulk of Plaintiff's request, but provided her with a payoff quote in early October 2021. (*Id.* at 8). The payoff quote explained that, to pay off the original $54,200 second mortgage, Plaintiff owed $173,002.17—including $114,453.23 in interest and $5,775.84 in late charges. (*Id.*). As this amount exceeded the equity Plaintiff had in the house, she was not able to move forward with the sale of her property. (*Id.*).

As a result, Plaintiff retained counsel and began to attempt to verify the second mortgage. (*Id.*). Counsel sent their first letter in October 2021 ("October Letter") identifying Plaintiff and requesting a host of documents relating to her loan with Defendant. (*Id.* at 8–9). After Defendant did not respond to the October Letter, counsel sent another in February 2022 ("February Letter"), again identifying Plaintiff and requesting information on her second mortgage, and also highlighting what Plaintiff believed to be multiple errors with the loan, including Defendant's failure to send periodic statements, to respond to the October Letter, and to maintain a proper accounting. (*Id.* at 9–10). This time, Defendant acknowledged receipt of the February Letter about a month later, and substantively responded about two months later. (*Id.* at 10).

Unsatisfied with Defendant's responses thus far and believing that Defendant was unable to enforce her second mortgage, Plaintiff filed suit.  (*See* ECF No. 2).  In her complaint, Plaintiff sought relief by way of five separate counts for the damages she allegedly suffered, including:  (1) the "consequential and incidental damages flowing from" her inability to complete the sale of her property; (2) emotional distress; and (3) myriad of actual damages, including but not limited to:

> the costs associated with seeking information she was not provided, costs associated with Defendant's failure to address the errors asserted by Ms. Lawler, loss of profit from the sale of the Property, costs associated with the unrealized sale of the Property, as well as alleged arrearages on the Second mortgage, capitalized costs, loss of equity, and improperly charged fees and interest.

(*Id.* at 11).

Approximately a year-and-a-half after filing suit, Plaintiff dismissed without prejudice four of her claims against Defendant, including, relevant here, her claims for:  (1) quiet title to the property; and (2) declaratory relief stating that Defendant has no right to enforce the second mortgage and that, even if it does, "no amounts are due and owing" due to Defendant's statutory violations.  (ECF No. 22 (stipulation of dismissal); ECF No. 2 at 18–19 (declaratory judgment and quiet title claims)).[1]  Shortly thereafter, Plaintiff moved for summary judgment on her two remaining claims under the Fair Debt Collection Practices Act ("FDCPA") and the Real Estate Settlement Procedures Act ("RESPA").  (*See* ECF No. 24).  Each party has filed timely responses (ECF Nos. 29, 32), and this Court held oral argument on Plaintiff's Motion on August 7, 2024 (ECF No. 41).  As no further briefing is required at this time, this Motion is ripe for this Court's review.

---

[1] In her Stipulation of Dismissal, Plaintiff dismissed her claims under the Truth in Lending Act ("TILA") and the Ohio Residential Mortgage Lending Act ("RMLA").  (ECF No. 22).

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail[.]'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

## III.     LAW & ANALYSIS

### A.  FDCPA

The FDCPA is an "extraordinarily broad statute" enacted to address what Congress deemed the "widespread problem" of "abusive, deceptive, and unfair debt collection practices by many debt collectors." *Frey v. Gangwish*, 970 F.2d 1516, 1518, 1521 (6th Cir. 1992) (citing 15 U.S.C. § 1692(e)). A successful FDCPA claim requires a plaintiff to prove four elements: 1) she is a "consumer"; 2) the debt at issue is a "consumer debt"; 3) defendant is a "debt collector"; and 4) defendant has violated one of the prohibitions in the FDCPA. 15 U.S.C. § 1692a–f.

Only the latter two of these elements are at issue here, as this Court agrees—and Defendant does not contest—that Plaintiff is a "consumer" seeking relief regarding a "consumer debt." 15 U.S.C. § 1692a(3), (5). And as to the fourth, more substantive, element, Plaintiff alleges that

4

Defendant used "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt" in violation of 15 U.S.C. § 1692e. (ECF No. 24 at 18). This Court takes each of the disputed elements in turn.

### 1. Debt Collector

The parties disagree about whether Defendant is an FDCPA-qualifying "debt collector." Under the FDCPA, a "debt collector" is "any person who": (1) "uses any instrumentality of interstate commerce or the mails in any business *the principal purpose* of which is the collection of any debts"; or (2) "regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be *owed or due another*[.]" § 1692a(6) (emphasis added). Defendant argues it is not a debt collector per the language of this second prong, as it "has not sought to collect the debt in question on behalf of another, nor has [it] sought to collect the debt in question under a name other than its own," the latter of which is a statutory exception. (ECF No. 29 at 6–7 (citing § 1692a(6), and *Garner v. Select Portfolio Servicing, Inc.*, 6th Cir. No. 17-1303, 2017 U.S. App. LEXIS 21546, at *8 (Oct. 27, 2017)).

This Court agrees, but finds this explanation to be insufficient to defend against the label of debt collector: It ignores the first prong, which categorizes a person as a debt collector if its "principal purpose … is the collection of *any* debts," regardless of whether the debts are one's own or someone else's. § 1692a(6) (emphasis added). While Plaintiff's opening brief is vague as to her theory for holding Defendant liable as a debt collector, she later more clearly articulates her theory that Defendant's "principal purpose … is the collection of debts[.]" (ECF No. 32 at 13). So, this Court looks to the nature of Defendant's business operations.

By way of deposition, Defendant described that it "purchase[s] nonperforming second[] [mortgages] and then … tr[ies] to work with the … borrower or the homeowners regarding their

delinquency." (ECF No. 23-1 at 12). In terms of proportion, Defendant went on to explain that the purchasing of first liens is "not a big part of [its] portfolio" as the "majority of [its] portfolio would be second mortgages" such that the "[m]ajority, but not all" of the loans it purchases are "already in default when [it] purchase[s] them." (*Id.* at 12–13). Given that, in Defendant's own words, Defendant's primary business is purchasing defaulted second mortgages, Defendant's "principal purpose … is the collection of … debts[.]" § 1692a(6). As such, Defendant is a debt collector under the FDCPA's definition of one.[2]

### 2. *Violation of 15 U.S.C. § 1692e*

Having satisfied the identity-based elements of the FDCPA, this Court turns to the substantive question: whether Plaintiff has sufficiently alleged that Defendant violated one of the FDCPA's prohibitions. Here, this involves analyzing whether Defendant "use[d] any false, deceptive, or misleading representation or means in connection with the collection of any debt" in its April 2022 response letter. 15 U.S.C. § 1692e; (*see* ECF No. 24 at 18).[3] Defendant protests such a finding, arguing that the relevant statement was not made "'in connection with' the collection of any debt" because it was "merely a response to an inquiry by the Plaintiff." (ECF No. 29 at 9).

### a. *In Connection with the Collection of any Debt*

As a threshold matter, this Court rejects Defendant's implication that a response to a debtor's inquiry cannot also be a § 1692e qualifying communication; indeed, Defendant's attempted dichotomy was not supported by any authority, and understandably so. (*See* ECF No.

---

[2] It also appears to be a debt collector under its own definition of one, as Defendant stated in no uncertain terms in the relevant communication. (*See* ECF No. 24-21 at 3 ("THIS IS AN ATTEMPT *BY A DEBT COLLECTOR* TO COLLECT A DEBT." (emphasis added)).

[3] This Court finds it worth noting that Defendant did not refer to this communication with any specificity beyond "the allegedly contradictory statement[.]" (ECF No. 29 at 9). For clarity, this Court understands Plaintiff to be taking issue with Defendant's April 2022 response letter, on the record as ECF No. 24-21 (hereinafter "April 2022 response letter").

29 at 9). The focus is not on what triggered Defendant's communication to Plaintiff, but on whether such communication was "in connection with the collection of any debt." § 1692e. And here, even viewing the facts in a light most favorable to Defendant, a reasonable jury could conclude that Defendant's April 2022 response letter was, in fact, a communication "in connection with the collection of" Plaintiff's debt.

Under the FDCPA, a "communication" is "the conveying of information regarding a debt directly or indirectly to any person through any medium." § 1692a(2). A communication "regarding a debt" must simply "imply the existence of a debt," which is a contextual inquiry. *Brown v. Van Ru Credit Corp.*, 804 F.3d 740, 742–43 (6th Cir. 2015). For this communication to be "in connection with the collection of" a given debt, it "need not itself be a collection attempt; it need only be 'connect[ed] with one.'" *Grden v. Leikin Ingber & Winters PC*, 643 F.3d 169, 173 (6th Cir. 2011) (citing § 1692e). This circuit, as do others, asks whether an "animating purpose of the communication" is to "induce payment by the debtor." *Id.* (citing *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 385 (7th Cir. 2010)). In this way, a communication "that aims to make a such a[ collection] attempt more likely to succeed[] is one that has the requisite connection." *Id.*

Certainly, "the statute does not apply to *every* communication between a debt collector and a debtor." *Id.* (citing *Gburek*, 614 F.3d at 384–85). Whether a specific communication has such a requisite connection turns on a balancing of the following factors:

> (1) the nature of the relationship of the parties; (2) whether the communication expressly demanded payment or stated a balance due; (3) whether it was sent in response to an inquiry or request by the debtor; (4) whether the statements were part of a strategy to make payment more likely; (5) whether the communication was from a debt collector; (6) whether it stated that it was an attempt to collect a debt and (7) whether it threatened consequences should the debtor fail to pay.

*Goodson v. Bank of Am., N.A.*, 600 F. App'x. 422, 431 (6th Cir. 2015) (citations omitted); *see, e.g.*, *James v. Ocwen Loan Servicing, LLC*, No. 1:17-CV-0501, 2017 WL 6336760 (S.D. Ohio

Dec. 12, 2017), *report and recommendation adopted*, No. 1:17-CV-501, 2018 WL 1173035 (S.D. Ohio Mar. 6, 2018).

As to whether the April 2022 response letter is a "communication" within the FDCPA's purview, the answer is yes. The face of the April 2022 response letter not only implies the existence of a debt, but explicitly acknowledged Plaintiff's defaulted second mortgage. Defendant described itself as "the owner and holder of the mortgage and note on the above-referenced property" as well as "the servicer of" the same; referenced Plaintiff's "loan"; and provided Plaintiff with a copy of her mortgage and payoff instructions. (ECF No. 24-21 at 2–3). The question, then, is whether the context of this communication reveals that an "animating purpose of the communication" is to "induce payment by the debtor." *Grden*, 643 F.3d at 173. This Court finds that it does, as most of the *Goodson* factors weigh in favor of such a finding.

The parties have no relationship other than debtor and debt collector; the relationship "at all times, centered around Plaintiff['s] delinquent account." *James*, 2017 WL 6336760, at *12. As to this specific communication, while it did not state Plaintiff's balance, it implied a balance owed to Defendant by way of explaining that "[t]he loan has been in default without the borrower having made any payments to the current owner." (ECF No. 24-21 at 2). And though Defendant did not make an express demand for payment nor did it threaten negative consequences for failing to do so, "such express statements are not required[.]" *James*, 2017 WL 6336760, at *12 (citing *Grden*, 643 F.3d at 173).

The one *Goodson* factor that does not favor Plaintiff's view is that the April 2022 communication "was sent in response to an inquiry or request by the debtor[.]" *Goodson*, 600 F. App'x at 431. Such a statement could be considered "merely a ministerial response to a debtor inquiry, rather than part of a strategy to make payment more likely." *Grden*, 643 F.3d at 173. But the April 2022 response letter stated, in bold capitalized letters, that it "is an *attempt by a debt*

*collector to collect a debt*." (ECF No. 24-21 at 3 (emphasis added)). This statement can "reasonably [be] considered part of a dialogue to facilitate satisfaction of the debt and hence can constitute debt collection activity." *Geary v. Green Tree Servicing, LLC*, No. 2:14-cv-00522, 2015 WL 1286347, at *12 (S.D. Ohio Mar. 20, 2015). And this statement was followed by the warning that "any information obtained will be used for that purpose," which is FDCPA-required language for communications with its consumers. *Id.* at *13. While "this language alone may not be enough to transform a document into a debt collection communication," it is evidence of such when considered in context, *id.*—the majority of which, here, cuts in favor of the April 2022 response letter being in connection with the collection of a debt.

### b. False, Deceptive, or Misleading Representations

This Court evaluates whether the April 2022 response letter included any "false, deceptive, or misleading representations" as Plaintiff alleges. As Defendant hangs its hat on its assertion that the communication is not "in connection with the collection of a debt," this Court is without opposition to Plaintiff's argument that Defendant, in the April 2022 response letter, "falsely stated that it provided all documents it had in its possession regarding the Second Mortgage." (ECF No. 24 at 19; *see* ECF No. 29 at 9 ("The Court does not even need to consider whether the statement itself was misleading[.]")).

Generally, "[w]hen a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited." *Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023). This Court nonetheless evaluates "all the materials properly before it under Rule 56(c)" to determine whether summary judgment is appropriate, as "the burden ... always rests with the movant." *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)). As applied to Plaintiff's § 1692e

claim, this involves determining, "from the perspective of the least-sophisticated consumer," whether a debt collector's language is false, deceptive, or misleading.[4] *Grden*, 643 F.3d at 172. In so doing, courts are liberally to construe the strict liability nature of the FDCPA in favor of the consumer. *Stratton v. Portfolio Recovery Assocs., LLC*, 770 F.3d 443, 448–50 (6th Cir. 2014).

In her second attempt to obtain information from Defendant regarding the validity of her Second Mortgage, Plaintiff requested seven categories of documents: "a) A complete accounting of the Second Mortgage; b) A copy of the security instrument; c) Copies of all images and versions of the mortgage note; d) All servicing notes; e) All correspondence sent to Ms. Lawler regarding any alleged default; and f) All mortgage statements." (ECF No. 24 at 8). In response, Defendant provided only her "Mortgage," "Note," "Assignment of Mortgage," and "Payoff & Reinstatement," directing her to "contact the original … lender and prior servicers for past information and documents" as it "does not have" the information she requested "other than what is attached and discussed above." (ECF No. 24-21 at 3). But Defendant directly contradicted its aforementioned statement once litigation ensued; Defendant ultimately produced myriad of documents that it, in no uncertain terms, told Plaintiff it did not have. (*Id.*). And during a deposition, Defendant's representative agreed when asked that such documents were "true and accurate business records of [Defendant.]" (ECF No. 23-1 at 19). In so doing, Defendant put on record that it did not, in fact, fail to provide the requested documents because it "does not have this information[.]" (ECF No. 24-21 at 3). So, "[e]ither intentionally or mistakenly, the letter specifically mischaracterized" what information Defendant had regarding Plaintiff's Second

---

[4] In other cases, the party opposing the allegations has asserted that, when a relevant communication is served on a party's attorney as opposed to the party themselves, an FDCPA violation should be governed by the "competent lawyer" standard instead of the least-sophisticated debtor standard. *See, e.g.*, *Myles v. Kaman & Cusimano*, LLC, No. 2:13-CV-01169, 2014 WL 4377854, at *6 (S.D. Ohio Sept. 4, 2014); *Barany-Snyder v. Weiner*, 539 F.3d 327, 333 n.2 (6th Cir. 2008). It does not appear that the Sixth Circuit has adopted such a position, at least not with any discoverable regularity. So, this Court continues to apply the long-standing least-sophisticated consumer standard.

Mortgage—information Plaintiff is owed. *Myles v. Kaman & Cusimano, LLC*, No. 2:13-cv-01169, 2014 WL 4377854, at *6 (S.D. Ohio Sept. 4, 2014).

Certainly, the least-sophisticated consumer standard "preserv[es] a quotient of reasonableness and presum[es] a basic level of understanding and willingness to read with care." *Barany-Snyder v. Weiner*, 539 F.3d 327, 335 (6th Cir. 2008) (cleaned up) (quoting *Kistner v. L. Offs. of Michael P. Margelefsky, LLC*, 518 F.3d 433, 438–39 (6th Cir. 2008)). But any level of reasonableness, understanding, and willingness to read with care does not explain the gap in the information Defendant advised Plaintiff it had compared to the information it later produced. Such a statement, then, is, if not patently false, at least deceptive or misleading. It does not require "a bizarre or idiosyncratic interpretation" of Defendant's April 2022 response letter to expect a consumer to believe that Defendant was unable to provide the documents necessary to confirm the validity of Plaintiff's Second Mortgage. *Id.* (quoting *Kistner*, 518 F.3d at 438–39). As such, summary judgment in Plaintiff's favor is proper on this narrow FDCPA claim: that Defendant violated the FDCPA through its false statement in its April 2022 response letter.

### 3. Damages

Plaintiff alleges that, as a result of Defendant's FDCPA violation, she "has incurred actual damages, including but not limited to":

> all costs associated with preparing and sending the October and February Letters, loss of profit from the sale of the Property, costs associated with the unrealized sale of the Property, as well as alleged arrearages on the Second mortgage, capitalized costs, loss of equity, and improperly charged fees and interest.

(ECF No. 2 at 17). She claims she has also experienced emotional distress damages due to Defendant's communications, and seeks attorneys' fees and costs. (*Id.* at 17–18). Defendant appears to make no attempt to counter Plaintiff's FDCPA damages arguments, instead relying on its assertions that there was no such FDCPA violation. But having established that Defendant's

April 2022 response letter constitutes an FDCPA violation, it is appropriate for this Court to consider what, if any, damages Plaintiff should receive as a result.

A "debt collector who fails to comply with any provision of" the FDCPA "is liable to such person in an amount equal to the sum of … any actual damage sustained by such person as a result of such failure" plus "such additional damages as the court may allow, but not exceeding $1,000" plus "the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1682k(a)(1)–(3). The FDCPA "does not require a plaintiff to satisfy the state law elements of emotional distress in order to recover damages," and FDCPA "[a]ctual damages include out-of-pocket expenses incurred, as well as emotional distress damages." *Rainier v. Law Offices of John D. Clunk Co., L.P.A.*, No. 2:13-cv-1173, 2017 WL 9439263, at *11 (S.D. Ohio Sept. 22, 2017). As a "plaintiff's testimony may be enough to establish emotional distress damages," this Court agrees that Plaintiff is entitled to have a jury hear her testimony in support of her damages. *Id.* (citing *Whaley v. Asset Mgmt. Grp., LLC*, No. 2:16-cv-375, 2016 WL 6134169, at *1 (S.D. Ohio Oct. 21, 2016)). Any other damages stemming from Defendant's FDCPA violation, including other actual damages as well as appropriate attorneys' fees and costs, will also be determined at that damages trial.

## B. RESPA

Like the FDCPA, RESPA is a remedial statute that is "construed broadly to effectuate its purposes." *Marais v. Chase Home Fin. LLC*, 736 F.3d 711 (6th Cir. 2013) (citing *In re Carter*, 553 F.3d 979, 985–86, n. 5 (6th Cir. 2009)). Under RESPA, loan servicers owe certain duties to borrowers, one of which is the obligation to respond to "qualified written requests" from a borrower or their agent. 12 U.S.C. § 2605(e)(1)(A). Such a request (a "QWR") is used to alert the loan servicer "that the account is in error" (known as a "notice of error" or "NOE") or to request

certain loan-related information (a "request for information" or "RFI").  § 2605(e)(1)(B).  The Sixth Circuit has consistently found "that the bar for adequately pleading RESPA violations dealing with qualified written requests is low," even at summary judgment.  *Miller v. Bank of N.Y. Mellon*, No. 21-1126, 2021 WL 5702331, at *4 (6th Cir. Dec. 1, 2021) (collecting cases).  To qualify as an action-warranting QWR, all a borrower has to do is provide, in writing:  (1) their name and account; and (2) enough detail to make the loan servicer aware of either the alleged error or the information requested.  *Id.*  A loan servicer's obligations differ depending on the type of QWR submitted by a borrower, but regardless, a servicer "shall provide a written response acknowledging receipt of the correspondence within 5 days" and shall take the appropriate substantive action within 30 days.  § 2605(e)(1)(A), (e)(2).

Relevant here are two of Plaintiff's letters to Defendant:  one from October and one from February.  As Plaintiff is a borrower and Defendant is a mortgage servicer, the question is whether the Letters are QWRs.[5]  This Court finds that they are.  "Each letter contains Ms. Lawler's name [and] account number, and provide[s] sufficient details regarding errors and requests for information," thereby surpassing RESPA's low bar.  (ECF No. 24 at 13–14).  This Court, then, focuses on whether Defendant was obligated to respond to a given Letter and if so, whether Defendant's response was sufficient.

### 1.  October Letter

In Plaintiff's view, Defendant improperly "wholly failed to respond to the October Letter." (ECF No. 24 at 14).  Defendant argues that it "never received the October [L]etter" but that

---

[5] Defendant mistakenly argues that "nowhere does Plaintiff allege that the October letter constituted a notice of error, qualified written request or request for information that would trigger response deadlines under RESPA."  (ECF No. 29 at 10).  This is wrong; Plaintiff plainly asserts that "[b]oth the October and February Letters qualify as QWRs" as "[e]ach letter contains Ms. Lawler's name, account number, and provide sufficient details regarding errors and requests for information." (ECF No. 24 at 13).

regardless, it "was also relieved of its duty to respond, as the October [L]etter was not sent to the proper address to direct inquiries," known as a "designated address."[6]  (ECF No. 29 at 10–11). Plaintiff, in response, explains that she sent the letter to a valid address of Defendant's and points out that this Court has rejected Defendant's non-designated address argument.  (ECF No. 32 at 5–6).

Plaintiff is correct about the applicable rule.  As this Court has explained, "[a] servicer's duties under RESPA are triggered only if: (1) the servicer receives a QWR; and (2) the written correspondence meets the statutory definition of a QWR."  *McMillen v. Resurgent Cap. Servs., L.P.*, No. 2:13-cv-00738, 2015 WL 5308236, at *5 (S.D. Ohio Sept. 11, 2015) (citing 12 U.S.C. § 2605(e)(1)(A)).  As to the receipt requirement, this Court adopted the view that "while the regulation allows a mortgage servicer to establish a separate and exclusive address, it does not *require* a borrower to send QWRs to that address."  *Id.* at *6–7 (emphasis added).  Adhering to the statute's broadly remedial purpose, this Court ruled "that RESPA is focused on the servicer's receipt of the borrower's QWR," not whether a borrower sent a QWR to a specifically designated address.  *Id.* at *7.

Applying the same here, the question is whether Defendant actually received the October Letter sent to Defendant's accurate Florida office address.  This appears to be a genuine question of material fact.  Defendant argues, supported by a signed affidavit, that it did not receive the October Letter prior to Plaintiff's inclusion of the October Letter in the February Letter, which it

---

[6] In so arguing, Defendant states that "[t]he Sixth Circuit held that 'though the Plaintiff claimed that she sent Chase a qualified written request on September 9, 2003, among other correspondence, Chase did not receive the correspondence, and therefore, Chase had no obligation under RESPA to respond in any way.'"  (ECF No. 29 at 11) (emphasis added).  But the case cited is not a binding appellate court decision, as Defendant misleadingly overstates.  Rather, it is from another judge in this Court's district.  *See Webb v. Chase Manhattan Mortg. Corp.*, No. 2:05-CV-0548, 2008 WL 2230696 (S.D. Ohio May 28, 2008).  And "the [o]pinions of other district courts are persuasive *but not binding authority* on this Court."  *Reuter ex rel. H.R. v. Medtronic, Inc.*, 996 F. Supp. 2d 671, 678 n.5 (S.D. Ohio 2014) (emphasis added).

undisputedly received. (ECF No. 29 at 10–12; ECF No. 29 at 26 (Aff. Of Thahn Vo)). Plaintiff argues that she "presented evidence that she sent the October Letter to a location that Trinity admitted is a valid address" and that Defendant is only able to claim it did not receive the October Letter because it was not sent via certified mail, unlike the February Letter. (ECF No. 32 at 5–6).

While the evidence supports that Plaintiff indeed sent the October Letter to Defendant's Florida office, the evidence does not establish that Defendant *received* the October, as is required for summary judgment in her favor. (*See* ECF No. 24-9; ECF No. 24-10). This is distinct from the issue in front of this Court in *McMillen*, wherein "it [wa]s undisputed that Defendant in fact received Plaintiffs' QWR … even though it was sent to [Defendant]'s general correspondence address" because the *McMillen* defendant sent that plaintiff a "letter notifying Plaintiffs of receipt of the letter[.]" 2015 WL 5308236, at *7. Here, Defendant's RESPA duties are not yet similarly triggered, as it remains to be determined whether Defendant actually received Plaintiff's October Letter at its Florida office. It is therefore inappropriate to award judgment as a matter of law on Plaintiff's RESPA claim as to the October Letter, as such a determination is a matter of fact for a jury.

### 2. *February Letter*

As to the February Letter, Defendant argues that while its response was RESPA compliant, the Letter was nonetheless not a QWR, let alone a proper NOE or RFI. (ECF No. 29 at 13). Instead, to Defendant's eye, the February Letter "was thinly disguised discovery[.]" (*Id.* at 14). This argument is rooted in Defendant's view that Plaintiff was not "challeng[ing] the *servicing* of the loan related to payment and application of payments" but rather was "challeng[ing] the *validity* of the loan itself as well as Trinity's standing as the holder of the note and mortgage[.]" (*Id.*) (emphasis added). Plaintiff disagrees, asserting that not only did the February Letter trigger

Defendant's NOE and RFI response obligations, but that this Court has already rejected Defendant's servicing-versus-validity challenge argument.  (ECF No. 24 at 14–15; ECF No. 32 at 1–4).

A servicer can validly respond to a RESPA-defined QWR in one of three ways:  (1) by making corrections to the account, § 2605(e)(2)(A); (2) following an investigation, by "clarify[ing] why the account is already correct," § 2605(e)(2)(B); or (3) after an investigation, by "provid[ing] the borrower with a written explanation or clarification that includes information requested and explains why information not provided cannot be obtained or provided by the servicer," § 2605(e)(2)(C).  *Baker v. Nationstar Mortg. LLC*, No. 2:15-cv-2917, 2018 WL 3496383, at *5 (S.D. Ohio July 20, 2018) (quoting *Bucy v. Pennymac Loan Servs., LLC*, No. 2:15-cv-2909, 2016 WL 5719804, at *8 (S.D. Ohio Sept. 30, 2016), *vacated*, No. 2:15-CV-2917, 2018 WL 6981208 (S.D. Ohio Sept. 4, 2018)).[7]  RESPA's servicer-response obligations are disjunctive, "meaning a servicer need not complete all three options to satisfy its obligation[.]"  *Id.*  That said, "a servicer does not have unfettered discretion about which of the three options to choose"; "it must choose the appropriate option under the circumstances."  *Id.* (first quoting *Hittle v. Residential Funding Corp.*, No. 2:13-CV-353, 2014 WL 3845802, at *8 (S.D. Ohio Aug. 5, 2014), then quoting *Marais*, 2014 WL 2515474).

Before determining whether Defendant's response was, indeed, RESPA compliant, this Court addresses Defendant's argument that the February Letter was not even a QWR.  As established above, the February Letter meets the statutory definition of a QWR.  This is so regardless of whether Plaintiff requested "information *relating to the servicing*" of her loan with Defendant.  § 2605(e)(1)(A) (emphasis added).  As this Court has held before, the QWR need not

---

[7] This Court's opinion was vacated only as a condition of the parties' settlement, not as a higher court's comment on the analysis—analysis by which this Court still stands.

be a "correspondence[] related to servicing" to trigger the respective NOE or RFI requirements. *Baker*, 2018 WL 3496383, at *5. The plain text of the relevant RESPA provision does not require as much, nor will "[t]his Court … read the word 'servicing' into the statute where it is not[.]" *Id.*

Having established as much, this Court turns to whether the NOE or RFI requirements were met—a topic on which Defendant provides little to counter Plaintiff's allegations that such requirements were not met. This Court agrees, and finds that summary judgment on Plaintiff's claim that Defendant's response to her February Letter violated RESPA is appropriate.

As to the NOE in the February Letter, upon receipt of an NOE, a loan servicer must either: (1) "[c]orrect[] the error and provid[e] the borrower with a written notification of the correction [and] the effective date of the correction"; or (2) "[c]onduct[] a reasonable investigation and provid[e] the borrower with a written notification," including (a) "a statement that the servicer has determined that no error occurred," (b) "a statement of the reason or reasons for this determination," (c) "a statement of the borrower's right to request documents relied upon by the servicer in reaching its determination," and (d) "information regarding how the borrower can request such documents[.]" 12 C.F.R. § 1024.35(e)(1)(i). Defendant all but admits it did no such thing. Instead, Defendant merely "advis[ed Plaintiff] that the loan had been assigned to [Defendant], and that [Defendant] was the holder and owner of the note and mortgage" and "enclosed a copy of the Mortgage, Note, Assignment of Mortgage, and Payoff and Reinstatement Letters." (ECF No. 29 at 13). This neither corrects the errors raised by Plaintiff nor explains why no such error occurred. Indeed, Defendant does not even acknowledge the NOE aspect of her February Letter, titling its response only regarding her requests for information. Such a response is statutorily insufficient.

And as to the RFI in the February Letter, Defendant was required either to: (1) provide her "with the requested information"; or to (2) "[c]onduct[] a reasonable search for the requested information and provide [her] with written notification that states that the servicer has determined that the requested information is *not available to the servicer* [and] provides the basis for the servicer's determination[.]"  12 C.F.R. § 1024.36 at (d)(1)(i)-(ii) (emphasis added).  Defendant objectively did not provide Plaintiff with the requested information, so to have complied with its RESPA requirements, the information must have not been available to them.  But such is not the case.

Relevant here, "not available to the servicer" means that the requested information is either "not in the servicer's control" or that it "cannot be retrieved in the ordinary course of business through reasonable efforts." Supplement I to Part 2014—Official Bureau Interpretation, https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa-interpretations.pdf (last accessed Aug. 5, 2024).  But as explained in the context of Plaintiff's FDCPA claim, the requested information was produced without fanfare during the course of discovery, and Defendant's agent agreed that such information was part of Defendant's business records. Certainly, Defendant could argue that producing as much took "extraordinary efforts to identify and restore," an argument this Court could consider on the merits. *Id.*  But it did not, appearing to hitch its wagon to the argument that the February Letter was not a QWR to begin with.  (*See* ECF No. 29 at 12–13).

Having rejected this argument, this Court sees no reason that the information Plaintiff requested was "unavailable" to Defendant.  For example, such information included something as simple as communications between the parties, information Defendant used in its favor to argue that Plaintiff was well aware of her loan.  The official commentary to the relevant regulation

contemplated just a scenario, explaining that when "[a] borrower requests a copy of a telephonic communication with a servicer and the servicer's personnel have access in the ordinary course of business to audio recording files … [,] [t]he information requested by the borrower is available to the servicer." Supplement I to Part 2014—Official Bureau Interpretation, https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-respa-interpretations.pdf (last accessed Aug. 5, 2024). Based on the record in front of it today, this Court sees no dispute over the facts underlying Plaintiff's claim that Defendant violated RESPA by way of its insufficient response to her February Letter. So, summary judgment on this claim is appropriate.

### 3. Damages

The parties disagree over what constitutes "damages" recoverable under RESPA, so this Court must provide clarity. A loan servicer who violates any aspect of RESPA "shall be liable" to an individual borrower "for each such failure" for: "(A) any actual damages to the borrower as a result of the failure; and (B) any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section, in an amount not to exceed $2,000." § 2605(f)(1). In the Sixth Circuit, "RESPA § 2605(f) does not preclude 'actual damages' from including emotional distress damages where such damages are adequately proven." *McMillen*, 2015 WL 5308236, at *10. But recovery under RESPA requires more than establishing a violation; such damages must be "casually related to a failure to properly respond to a QWR." *Tsakanikas v. JP Morgan Chase Bank N.A.*, 2:11-cv-888, 2012 WL 6042836, at *2 (S.D. Ohio Dec. 4, 2012); *McMillen*, 2015 WL 5308236, at *10. Additionally, a borrower can receive "the costs of the action, together with any attorneys fees incurred in connection with such action as the court may determine to be reasonable under the circumstances." § 2605(f)(3).

Plaintiff pleads actual RESPA damages, including but not limited to:

all costs and expenses associated with preparing and sending the October and February Letters, loss of profit from the sale of the Property, costs associated with the unrealized sale of the Property, as well as alleged arrearages on the Second mortgage, capitalized costs, loss of equity, and improperly charged fees and interest.

(ECF No. 2 at 13). She further alleges "emotional distress" as a result of the unrealized property sale, and claims that Defendant "has engaged in a pattern or practice of non-compliance with the requirement of the mortgage servicer provisions of RESPA." (*Id.*; ECF No. 24 at 16). In so doing, she argues that she has at least "shown adequate evidence to allow this lawsuit to go to trial on the issue of actual damages." (ECF No. 24 at 16).

Defendant challenges, among other things, Plaintiff's RESPA standing because, in its view, Plaintiff's damages all coalesce around her attorneys' fees and litigation costs, which it claims cannot serve as the basis for federal jurisdiction. (ECF No. 29 at 20). While Defendant is correct that such costs alone may not allow her to litigate in front of this Court, Plaintiff claims a host of damages, many, if not all, of which are "separate and distinct from litigation costs in the RESPA litigation." *Hurst v. Caliber Home Loans, Inc.*, 44 F.4th 418, 423 (6th Cir. 2022) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)); (*see* ECF No. 2 at 13). As these damages, including the Letters and unrealized property sale, arise "from a separate proceeding," they "do not raise typical standing concerns because the harm has already materialized[.]" *Hurst*, 44 F.4th at 423.

Having cleared the procedural hurdle, this Court turns to the substance of her damages. Again, Defendant's arguments fail because its arguments ignore that Plaintiff alleges actual damages beyond litigation costs. For example, "costs a borrower incurs due a to a servicer's RESPA violations are actual damages." *Id.* (citing *Marais*, 736 F.3d at 720–21). And whether

Defendant's RESPA violations played any role in the unrealized sale of Plaintiff's home, as well as whether Defendant's RESPA violations evidence a pattern or practice, are questions of fact, inappropriate for summary judgment at this time. As Plaintiff requests, "[t]he issue of damages will be determined at a trial to be set at a later date." *Baker*, 2018 WL 3496383, at *13.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (ECF No. 24) is **GRANTED IN PART AND DENIED IN PART**:  **GRANTED** as to Plaintiff's April 2022 response letter FDCPA claim and Plaintiff's February Letter RESPA claim, and **DENIED** as to Plaintiff's October Letter RESPA claim. The issue of damages for both the FDCPA and RESPA claims will be determined at a trial to be set at a later date due to remaining questions of fact.

**IT IS SO ORDERED.**

ALGENON L. MARBLEY
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  August 21, 2024**

21